JOSEPH P. KELLY *vs.* BOSTON AND MAINE RAILROAD.

Middlesex.     February 5, 1946. — May 16, 1946.

Present: FIELD, C.J., QUA, DOLAN, WILKINS, & SPALDING, JJ.

*Negligence*, Railroad: spur track; Invited person; Contributory. *Evidence*, Custom, Relevancy and materiality, Cumulative.

Evidence of a custom of employees of a crushed stone company respecting their handling of railroad cars after the cars had been "spotted" on a spur track on the company's premises by a railroad train crew and were not thereafter to be moved by the train crew, where it properly could be inferred that the train crew knew of the custom, was admissible at the trial of an action against the railroad corporation by one of the crushed stone company's employees for personal injuries sustained through alleged negligence of the train crew in backing such cars after they had been "spotted."

Evidence of the meaning of certain signals used by railroad brakemen was admissible on the issue of the defendant's negligence in an action against a railroad corporation for personal injuries sustained through the sudden backing of cars.

The admission of testimony as to what the witness and the plaintiff had "decided" to do on a certain occasion and what the witness "supposed" was then the situation, if error, was harmless in the circumstances where it appeared on other evidence what they had decided and what they supposed.

Evidence warranted a finding that an employee of a crushed stone company was by implication an invitee of a railroad corporation while, in the course of his duties, he was attempting to move a railroad car after it had been "spotted" on a spur track belonging to his employer and located on his employer's premises.

A finding of negligence of a railroad train crew toward an employee of a crushed stone company was warranted, and a ruling that the employee was guilty of contributory negligence was not required, on evidence of the circumstances in which, while he was rightfully working at the rear end of a line of railroad cars after they had been "spotted" by the train crew on a spur track on the crushed stone company's premises, he was injured when the cars suddenly and without adequate warning were backed contrary to the custom of the train crew never to move cars after they had been "spotted."

TORT. Writ in the Superior Court dated February 4, 1944.

The action was tried before *Brogna,* J.

*J. P. Rooney,* for the defendant.

*R. W. Reardon,* (*N. F. Fermoyle* with him,) for the plaintiff.

WILKINS, J. This is an action of tort for personal injuries sustained by the plaintiff through the allegedly negligent movement of a train owned by the defendant and operated by it on a side track in Winchester belonging to the plaintiff's employer. The jury returned a verdict for the plaintiff. The defendant's exceptions relate to the admission of evidence, to the denial of its motion for a directed verdict, and to the charge.

The jury could have found the following facts: On May 24, 1943, the plaintiff was employed by the General Crushed Stone Company, for which he had worked six or seven years. His duties covered "all classes of work," including loading cars, cleaning up, and, for five years before the accident, assisting in moving cars left by the defendant "down to the hopper," or crusher. The defendant was the only railroad which brought in cars, and for a number of years had backed in and left cars on a siding owned by the General Crushed Stone Company near Holton Street, a public way. At "the point of the accident the land and the rails and the property were the property of the General Crush Stone Company." The track extended slightly downgrade from Holton Street "right down under the crusher." At thirty or forty feet from the "hopper" the track was "almost on a flat," but as it approached Holton Street the grade gradually increased. The plaintiff was injured about 9:15 A.M. He had been "cleaning up around," and was standing on the north side of the track about thirty-five feet from the "hopper" with one Fitzgerald, an employee of the General Crushed Stone Company, who loaded cars and who had had some experience as a brakeman in the employ of the defendant. There were six or seven cars which had been left the previous day about one hundred feet from the "hopper." The plaintiff saw an engine backing in ten more cars. The plaintiff and Fitzgerald "stepped aside." A brakeman named Dempsey coupled the ten cars onto the cars that were there. The

plaintiff and Fitzgerald motioned Dempsey to move the cars toward the "plant," and he in turn motioned "up ahead" to that effect. As the cars came back and the rear car was about forty feet from the crusher, Fitzgerald gave Dempsey the signal that he wanted them "spotted" there, which was just above where Fitzgerald and the plaintiff were standing. Dempsey, who was then about one hundred fifty feet away at a loading platform on the north side of the track, signaled up forward, and the cars were "spotted." Dempsey "gave the high sign," and walked back on the north side of the track toward the engine. Fitzgerald saw him go toward the front end of the train until he was almost out of sight. The crew consisted of a conductor, two brakemen, an engineer, and a fireman. Dempsey came in almost every day with the cars, and the other crew members were "more or less the same." The train, consisting of sixteen or seventeen "regular coal cars with a little overhang in the back," extended beyond a crossing at Holton Street, and both from where the plaintiff and Fitzgerald were and from the other side of the train the engine could not be seen. Five or ten minutes, or six or eight minutes, elapsed while the train was stopped, and during that time the plaintiff busied himself in cleaning up loose stones. The plaintiff and Fitzgerald then "started to go to work." At that time there were no employees of the defendant near the rear end of the line of cars, and none could be seen from the south side of the track, and only Dempsey, as above described, from the north side. No smoke was visible, although the view was not obstructed. The plaintiff procured a "jack," or bar, four and one half or five feet long, which was down by the side of the "hopper," and took it to the rear end of the last car on the south side of the track where Fitzgerald was. The plaintiff stood on the southerly rail directly in back of the right rear corner of the car. He put the "jack" partly under the wheel, so that the car could be moved slightly upgrade, while Fitzgerald started toward the front of the car to uncouple the pin. The plaintiff had not placed the "jack" "exactly under the wheel" when he saw the wheel moving. The wheel

struck the "jack," and "some kind of a pressure came on his hand," causing him to "let go." He "grabbed the back of the car," and, as soon as he did, the car came back and knocked him sideways, and his leg went down under it. His foot was under the wheel while "he was hanging on there," and he "felt his toes getting squeezed." The train "suddenly" moved backward about twenty feet and stopped. Fitzgerald went to the assistance of the plaintiff, who was still hanging on to the car. A "couple of minutes" later Fitzgerald saw smoke and "just the front end" of the engine, which was "pulling back over the crossing." At that time he "supposed" that the engine had already gone. Neither the plaintiff nor Fitzgerald heard any signal that the cars were to be moved. If a signal had been blown, it could not have been heard where they were, either because the stone crusher was in operation or for some other reason. Sometime later after the engine had gone, Fitzgerald went up to Holton Street and found that one car had been pulled back over on the farther side of the crossing, that the street was "free," and that the front end of the second car was "flush with Holton Street" on the stone crusher side. The six or seven cars as they had stood there from the night before had hand brakes set. These brakes were invariably set by the brakemen and never by the employees of the "quarry." They were still set after all the cars were "spotted." Consequently, before the car in question could be moved, it was necessary to release the brake, as Fitzgerald was going to do. After releasing the brake that car, which was "on the flat," would not start "until you bar it down." There was not grade enough to start it, and "they would have to give it another push to get it down underneath the hopper." When an engine is uncoupled after "spotting" cars, the engine has to back one to three inches to enable the brakeman to release the coupling pin, but in the case of a sixteen car train there would be no movement of the rear car.

1. There was additional evidence which was admitted subject to the defendant's exception. The greater part of such evidence related to testimony by the plaintiff and

Fitzgerald as to the custom or practice in the delivery of
cars over a period of "two or three years." The substance
of their testimony was that the defendant brought in cars
every other day on the average; that the defendant
"spotted" the cars at a point determined by the plaintiff
and Fitzgerald, usually about one hundred feet from the
crusher; that the plaintiff or Fitzgerald signaled the brake-
man (who was on the ground or on one of the rear cars)
where they wanted them "spotted"; that that brakeman
signaled to another brakeman at the end of the train where
the engine was; that the engine went away eventually;
that the railroad never moved the cars once they had
"spotted" them at the designated place; that after the
cars were "spotted" the plaintiff and Fitzgerald waited
six or eight minutes or five or ten minutes as a rule before
they started to use any of the cars; that they would clean
up around "until they would make sure that all was clear";
that if they did not want the car right away they might let
it stay "for an hour or so"; that the plaintiff placed the
"jack" under the wheel to "slacken up" the car two or
three inches so that Fitzgerald might take out the coupling
pin; that Fitzgerald then got on the car and handled the
hand brake; that the plaintiff proceeded to "bar it down,"
or "jack" the car down; that Fitzgerald stopped the car
underneath the crusher; that this was done nearly every
day; that the railroad generally brought in more cars and
left them on the track; and that the employees of the Gen-
eral Crushed Stone Company would not "see them for a
day or two and then the defendant corporation would come
in the next day and push them over."

The exception to the admission of the evidence of custom
must be overruled. One objection of the defendant is that
it did not appear that the defendant knew, or had any means
of knowing, what the custom was. This, of course, does not
refer to the evidence of what the employees of the defendant
habitually did or did not do, and in particular does not
apply to the evidence that the defendant never moved cars
after they were "spotted." So far as it relates to what the
plaintiff and Fitzgerald habitually did, it could have been

found that the train crew was about the same at all times, that the defendant backed in cars nearly every other day, that the "spotting" of the cars was done by the train crew upon the instructions of the plaintiff and Fitzgerald, and that in some manner thereafter the cars were loaded by the General Crushed Stone Company. From this it could have been inferred that the train crew knew what was the custom of the employees of the General Crushed Stone Company as to moving individual cars for the purposes of loading. *Hines* v. *Stanley G. I. Electric Manuf. Co.* 199 Mass. 522, 525–526, *S. C.* 203 Mass. 288, 289–290. *LaFond* v. *Boston & Maine Railroad,* 208 Mass. 451, 457. *Hanley* v. *Boston & Maine Railroad,* 286 Mass. 390, 398. Since the evidence warranted a finding that the defendant knew of the custom, *Papandrianos* v. *New York Central & Hudson River Railroad,* 244 Mass. 216, 218, is distinguishable. The defendant also objects that the conditions prevailing on the day the plaintiff was injured were entirely dissimilar in important respects to those obtaining on previous occasions, in that on this occasion the train was across a public way and the engine was out of sight. But it cannot be assumed that the previous occasions were confined to those when the engine was on the property of the General Crushed Stone Company. The evidence that the cars had never been moved after they were "spotted" was unqualified, and there is no ground for implication of the suggested dissimilarities. None is to be found in the fact that the six or seven cars that were left from the previous day were attached to the ten new cars apparently without specific instructions from the plaintiff and Fitzgerald. Although the six or seven cars were one hundred feet from the crusher in a place which could be found to be usual for "spotting," the evidence was not such as to require a finding that they had been "spotted" before the day in question, and the jury could have found that they were within that testimony as to cars which were brought in and left on the track and which the employees of the General Crushed Stone Company would not "see . . . . for a day or two" until the defendant came in to "push them over." It likewise is not a valid objection that the testimony

that the plaintiff and Fitzgerald waited from five to ten, or six to eight, minutes when they wished to use a car right away was too vague.

2. Fitzgerald testified on direct examination that he had worked for a railroad as brakeman, yard clerk, and freight clerk; that he had worked in Woburn for the defendant on "the Woburn Switcher"; that he had last worked there in 1936 or 1937; that he had been a brakeman for three or four months during the vacation of other employees during the "last war"; that there are only four or five motions that brakemen use; that certain motions are to notify the engineer or brakeman the track to be worked on; that to start a car backing the motion is circling both arms and hands outwardly; that to stop or "spot" cars the motion is a wave of the hands palm downward; and that there is a motion with both hands up perpendicularly. Subject to the defendant's exception Fitzgerald testified that that motion means "everything is all right." This exception lacks merit. It is not argued that Fitzgerald was not qualified to testify to the meaning of the signal. There is no weight to the objection that it did not appear that the plaintiff also knew its meaning. The plaintiff's almost daily experience in "spotting" cars over a period of several years was sufficient to permit the jury to find that he did know. It was not necessary, however, that the plaintiff have such knowledge. The meaning of the signal was admissible upon the issue of the negligence of the defendant.

3. On direct examination Fitzgerald was asked, "Then tell us what you did and what you saw Mr. Kelly do." He answered, "Mr. Kelly and I decided it was time to move the cars, so Mr. Kelly went back to the crusher and picked up his car jack, and I walked around the side of the train and looked up. I couldn't see anything and I supposed everything was all clear." Counsel for the defendant then said, "May that go out? I object to what Kelly decided to do and what the witness supposed." The judge replied, "I will let it stand and save your exception." This exception must be overruled. The answer added nothing to the evidence. It is otherwise obvious that the plaintiff and Fitz-

gerald had decided it was time to move the car. Their practice had always been to wait after the cars were spotted to "make sure that all was clear." On the other evidence it is apparent that it could have been found that they so supposed on this occasion. Also, Fitzgerald testified without objection that when he saw the engine pulling out, "he had supposed they had already gone." *DiAngelo* v. *United Markets Inc.*, *ante*, 143, 145, and cases cited. The answer was not objected to on the ground that it was unresponsive. *Lury* v. *New York, New Haven & Hartford Railroad*, 205 Mass. 540, 547. *Mielke* v. *Dobrydnio*, 244 Mass. 89, 91.

4. There was no error in the denial of the motion for a directed verdict. Not only the land but the actual tracks at the scene where the plaintiff was injured were the property of the plaintiff's employer. It could have been found that the presence of the plaintiff and the duties of his employment were, or should have been, known to the defendant, and that the plaintiff had waited a reasonable time before undertaking to move the car for his employer's purposes. *Pratt* v. *New York, New Haven & Hartford Railroad*, 187 Mass. 5, 7. *Bachant* v. *Boston & Maine Railroad*, 187 Mass. 392, 397. In view of the noises attendant upon the operation of the stone crusher and of the fact that for this or some other reason an audible signal could not have been heard anyway, it could have been found negligent not to afford the plaintiff some other warning. *Gregory* v. *Maine Central Railroad*, 317 Mass. 636, 639, and cases cited. It cannot be argued on the testimony that the defendant took any other precaution for the plaintiff's safety before suddenly backing the train twenty feet, or that the evidence was inadequate to warrant a finding that the plaintiff did not know that the train was about to move before it did move. There were no members of the train crew near the rear car, and it could have been found that the last observed signal of any kind was the "high sign," or signal that "everything is all right," given by Dempsey before he departed toward the engine, and that this was an act which completed the "spotting" of the cars, at least in the absence of further warning from the train crew. This conclusion was

not precluded by the statement in the judge's charge, which was not the subject of exception by anyone, that "The defendant's cars had a right to be there also, because apparently it is not controverted that they were in the act of delivering cars to this private siding to be loaded and to be used by the plaintiff employee." This cannot properly be construed as a ruling that the act of delivery had not been completed. The judge immediately said, also without objection from anyone, "And in the act of delivering those cars there the defendant had a right to move those cars into and over that siding at such place or point as the Crushed Stone Company desired them to be set." Read together, the two sentences quoted from the charge inferentially state that there was no right to deliver at a point not desired by the General Crushed Stone Company. It is not contended that the second unexpected movement of the cars, which resulted in the plaintiff's injuries, was to a point desired by the plaintiff and Fitzgerald, who were the representatives of the General Crushed Stone Company in selecting the point for "spotting." This is not the same thing as saying that the defendant's right to move trains on the premises of the General Crushed Stone Company was "limited by designation of employees" of that company, a statement which the judge in his supplemental charge disclaimed making. Nor is it correct to argue that the only inference permitted by the evidence was that the delivery of the cars had not been completed. There was nothing to indicate that it was necessary to move the rear car in order to uncouple the two forward cars which were in whole or in part across Holton Street. And the argument goes too far which asserts that there could be no delivery of any car until all the cars were on the property of the General Crushed Stone Company. If this were true, no car was delivered, because the front car was finally left on the opposite side of Holton Street. In *Burns* v. *Boston & Lowell Railroad,* 101 Mass. 50, distinguishing facts are that the car was located upon premises of the railroad; that there was nothing to permit a finding that the plaintiff was authorized to touch the car; and that the plaintiff's conduct was in any

event negligent. In *Hyslop* v. *Boston & Maine Railroad,* 208 Mass. 362, evidence was lacking from which it could be inferred that the car was available for use. The defendant urges that as to the cars in the case at bar the plaintiff was a trespasser, or at most a licensee. This argument, however, does not take into consideration everything that the jury could find, including the fact that at the moment he was hurt the plaintiff, as the defendant knew or should have known, could consider the car available for his use in carrying out his duties on behalf of his employer. The jury were not required to find that the plaintiff was acting contrary to the wishes, or at most with the mere acquiescence, of the defendant. *Ward* v. *New York Central Railroad,* 248 Mass. 115, 117–118. The right to approach the car need not have been based upon express invitation, as was the case in *Flynn* v. *Boston & Maine Railroad,* 204 Mass. 141. The plaintiff was not obliged to show that he was actually engaged in loading; it was enough if he was taking the car for that purpose. Nor was the plaintiff's right to approach the car contingent upon the uncoupling of the engine. There was no such evidence, while there was evidence that the engine could be uncoupled without moving the rear car. If the jury accepted the evidence that the reason for waiting five to ten, or six to eight, minutes was to "make sure that all was clear," they were not required to find that this was to enable the engine "to uncouple and leave the yard," which was testified by Fitzgerald, but not by the plaintiff, to be the purpose of waiting on the occasion in question. Nor, if the jury accepted the evidence as to the period of waiting, were they required to find that it was anything more than a factor of safety voluntarily adopted by the plaintiff and Fitzgerald. Likewise the fact that the train was across a public way where it could not be left for more than five minutes without violating G. L. (Ter. Ed.) c. 160, § 151, and the fact that the engine could not be seen by the plaintiff were but some of the relevant circumstances which the jury might take into consideration. In fact, the inability of the plaintiff to see the engine also might serve in the jury's mind to demonstrate in turn the

inability of anyone near the engine to see what was going on in the rear of the train.  It could have been found to be lacking in proper vigilance toward the employees of the General Crushed Stone Company — and, therefore, negligent in the circumstances — to back the train without any member of the crew in a position to observe the tracks to be traversed. See *Frasciello* v. *Baer,* 304 Mass. 643, 645, and cases cited.

If the jury accepted the evidence of custom, they could find that the defendant was negligent in the departure from it.  *LaFond* v. *Boston & Maine Railroad,* 208 Mass. 451, 457.  *Flaherty* v. *New York Central & Hudson River Railroad,* 211 Mass. 570, 572.  *Mackenzie* v. *New York Central & Hudson River Railroad,* 211 Mass. 586, 589.  *Godfrey* v. *Old Colony Street Railway,* 223 Mass. 419, 420.  *French* v. *Boston & Maine Railroad,* 230 Mass. 163, 165, 166.  *Hanley* v. *Boston & Maine Railroad,* 286 Mass. 390, 398.  *Wheeler* v. *Boston & Maine Railroad,* 310 Mass. 638, 641.

For similar reasons, it could not have been ruled as matter of law that the plaintiff was chargeable with contributory negligence.  The underlying factors have already been stated and need not be repeated.  *Kean* v. *New York Central & Hudson River Railroad,* 210 Mass. 449, 453.  *Griswold* v. *Boston & Maine Railroad,* 213 Mass. 12.

5. During the charge the judge stated, "If the plaintiff was an employee of the Crushed Stone Company, and if he was there in furtherance of the business of his employer, the Crushed Stone Company, then he had a right to be there to perform such work as was his job for the Crushed Stone Company."  At the conclusion of the charge the defendant excepted.  The judge then gave a supplemental charge on this matter as follows: "What I meant by that is this.  The plaintiff had a right to be there at and about the cars, to work upon the cars for such work as it was his duty to do for his employer.  I did not intend to say to you, and I do not say to you, that you would not be warranted finding, however, that what he did, when he did it, could be negligent conduct on his part."  The defendant again excepted.  It now argues that the foregoing took from the jury the whole question as to whether the defendant had any duty of care toward

the plaintiff. In so far as this argument is based upon the contention that the plaintiff was not an invitee as to the defendant's cars, it is covered by what we have already said. In so far as it may be based upon an alleged omission to state the pertinent principles underlying the duty owed by the defendant to the plaintiff, the argument is untenable. The jury were fully instructed on the issue of the defendant's liability, and among other things were told: "All that the defendant is required to do is to act in the manner in which the ordinary cautious, prudent person engaged in that same type of work under the circumstances would have acted, having in mind the nature of the undertaking and the circumstances which existed here at this time, or which by the exercise of reasonable prudence and foresight should have been anticipated . . . did exist."

6. One further exception to the charge has been argued. It is based on the fact that the jury were instructed that on the issue of the defendant's negligence they should consider the elapsed time between the "spotting" of the cars and the commencement of the use of them by the plaintiff. This exception raises no new question. The defendant's contentions in this respect, namely, that the defendant did not know of the prior practice, that the practice was too vague as to time, and that conditions were dissimilar on the day in question, have already been considered.

*Exceptions overruled.*